IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| LACEY M. SIVAK, | ) | |
| | ) | Case No. CV-96-56-S-BLW |
| Petitioner, | ) | |
| | ) | **CAPITAL CASE** |
| v. | ) | |
| | ) | **MEMORANDUM DECISION** |
| JOHN HARDISON, Warden, | ) | **AND ORDER** |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## INTRODUCTION

The Court previously dismissed several claims in this capital habeas matter as procedurally defaulted. (Docket No. 170.) Still pending are Claims 1, 2, 4-13, 15 and 18 in the Second Amended Petition. After considering the pleadings, briefing, oral argument, and the record herein, the Court concludes, for the reasons that follow, that Petitioner is not entitled to habeas relief.

## FACTUAL BACKGROUND

In early 1981, Lacey Sivak worked as a cashier at a Baird Oil gas station in Garden City, Idaho. (State's Lodging A-6, p. 479.) Sivak's deposits were occasionally less than they should have been, and he complained to his supervisor that another cashier, Dixie Wilson, was altering his daily reports so that the

**Memorandum Decision and Order - 1**

deposits would appear to be short.  (State's Lodging A-6, p. 480.)  The supervisor eventually grew tired of the conflict between Sivak and Wilson, and Sivak was fired in mid-February of 1981.  (State's Lodging A-6, pp. 482-83.)  He continued to frequent the station, however, warning other employees that they should be wary of Wilson.  (State's Lodging A-6, pp. 496-97, 508-09.)

Six weeks after he was terminated, Sivak stole a .22 caliber pistol, an extra cylinder, and a small derringer from a Western Auto store where his mother worked.  (State's Lodging A-7, p. 643; State's Lodging A-9, pp. 960, 1015.)

On April 4, 1981, someone called the Baird Oil station without identifying himself and asked whether it would be open the following Monday, and, if so, which employee would be on duty.  (State's Lodging A-6, p. 509-10.)  The clerk recognized the caller as Sivak but did not mention his name.  (State's Lodging A-6, p. 510.)  Instead, he said that Wilson would be opening the station that morning at 7:00 a.m.  (State's Lodging A-6, pp. 510-13.)

At approximately 6:45 a.m. on Monday, April 6, Gary Chilton arrived at the station and filled up his truck with gas.  (State's Lodging A-5, p. 264.)  When he went inside to pay, he saw Sivak and another man, later identified as Randy Bainbridge, standing in the small merchandise area while Wilson sat behind the

**Memorandum Decision and Order - 2**

counter.[1]  (State's Lodging A-5, p. 266.)  Chilton said hello and gave Wilson $5.00 for the gas, but he received no response.  (State's Lodging A-5, pp. 267-68.)  The atmosphere was tense, and he considered driving around the block and coming back to check on Wilson, but he decided to go on to his destination.  (State's Lodging A-5, p. 270.)

A few minutes later, Gloria Leyden pulled her pickup into the parking lot. Leyden was acquainted with Wilson and intended to buy some cigarettes from her, but as she peered into the store she saw only two men; Sivak was standing by the Coke machine and Bainbridge was moving his hands through the cash drawer. (State's Lodging A-5, p. 291-93.)  Leyden noticed that Sivak said something to Bainbridge and started to walk toward the door, at which point she decided to drive away.  (State's Lodging A-5, p. 295.)

Ten minutes after Leyden left, another customer arrived and found Wilson lying on the floor in a back room.  (State's Lodging A-6, pp. 329-32.)  She was gasping for air,  her face was bloody, and her blouse was pulled up over her breasts.  (State's Lodging A-6, pp. 321-25.)  The police officer who responded to the scene found an open cash drawer, an empty money bag, and a knife blade on

---

[1]  Chilton would later be able to identify only Bainbridge, but Sivak admitted at trial that he and Bainbridge were both at the gas station that morning.

**Memorandum Decision and Order - 3**

the floor.  (State's Lodging A-6, p. 349-52.)  The comptroller for Baird Oil would later determine that $185 in cash and $200 in checks had been stolen.  (State's Lodging A-6, pp. 464-66.)

Wilson was taken to the emergency room at a nearby hospital, where she died.  (State's Lodging A-4, p. 13-14.)  An autopsy revealed that she had been stabbed over twenty times and shot five times in her head and neck.  (State's Lodging A-4, pp. 43-44, 50-52.)  The pathologist retrieved .22 caliber bullets from her body, and other .22 caliber bullets were found at the crime scene.  (State's Lodging A-4, p. 48; State's Lodging A-6, pp. 379-81.)

Two days after Wilson's murder, Vaughn Killeen, an investigator with the Ada County Prosecuting Attorney's Office, interviewed Sivak at his home. (State's Lodging A-7, p. 675.)  During that interview, Sivak admitted to Killeen that he and Wilson did not get along and that he had been fired after being accused of stealing money.  (State's Lodging A-7, p. 675.)  He also revealed that he and Bainbridge had been at the gas station on the morning of Wilson's death, around 6:30 a.m., but he claimed that they left after five minutes and did not have anything to do with Wilson's murder.  (State's Lodging A-7, p. 675-76.)

Killeen next interviewed Bainbridge.  After he made incriminating statements, he and Sivak were arrested for robbery and first-degree murder.

**Memorandum Decision and Order - 4**

(State's Lodging A-7, p. 683.)

Police officers obtained a search warrant for a storage shed rented by Sivak, in which they discovered the .22 caliber pistol and the derringer that had been stolen from the Western Auto store, in addition to the extra cylinder and a box of .22 caliber shells.  (State's Lodging A-7, pp. 663-85.)  Sivak's fingerprint was found on the barrel of the pistol, which contained no other discernable prints.  (State's Lodging A-8, p. 797.)  Ballistics testing on this weapon established that it had fired the bullets that killed Wilson.  (State's Lodging A-8, pp. 825-27.)

Within about a week of Sivak's arrest, an Ada County jail inmate named Jimmy Leytham approached law enforcement officers and told them that Sivak had confessed to him.  At the preliminary hearing, Leytham testified that he had asked Sivak "why he shot and stabbed her so many times," to which he replied, "because she kept on moving."  (State's Lodging Aa, p. 230.)  Leytham also claimed that Sivak told him he had used a .22 caliber handgun and that he threw the knife handle "in the river by the fairgrounds."  (State's Lodging Aa, p. 230.)  He said that he had worked at the gas station and that he held a grudge against Wilson.  (State's Lodging Aa, p. 231.)

Sivak and Bainbridge were bound over for trial on charges of robbery and first-degree murder.  The State alleged that Wilson's death was premeditated and

**Memorandum Decision and Order - 5**

deliberate (Count II) and that she was killed during the course of the robbery (felony murder) (Count III).  The charges against Bainbridge and Sivak were severed and assigned to different trial judges.

In a pretrial motion, the Ada County Prosecuting Attorney, Jim Harris, requested permission to take Jimmy Leytham's deposition, which was granted.  At a hearing on Sivak's motion to set aside that order, Vaughn Killeen testified that Leytham "has been uncooperative and he's been demanding money for testimony at trial, and he doesn't wish to testify unless we pay him money."  (State's Lodging A-15, pp. 18-19.)  Leytham's deposition was taken on August 12.

The jury trial began on September 14, 1981.  Leytham appeared and testified for the State in a manner similar to his preliminary hearing testimony.  Although he admitted that pending escape and burglary charges had been dismissed and that he had been paroled from prison, he denied that sought or expected a benefit for testifying, claiming instead that he had decided to help the State because he had "a wife and kids out on the streets, and [he] wouldn't want anything to happen to them."  (State's Lodging A-7, p. 535.)  When asked whether he had "ask[ed] for any particular thing – any particular favoritism from State authorities with regard to his willingness to testify in this case," he said that he had not.  (State's Lodging A-7, pp. 535-36.)

**Memorandum Decision and Order - 6**

Another county jail inmate, Duane Grierson, testified that Sivak had also made incriminating statements to him after the preliminary hearing.[2]  According to Grierson, Sivak said that Bainbridge committed the robbery but that he had killed Wilson.  (State's Lodging A-7, p. 590.)  Grierson claimed that Sivak said that he "reached a sexual climax from pushing on the body," and that Bainbridge was "playing with her boobs."  (State's Lodging A-7, p. 590.)  During an extensive cross-examination, Grierson conceded that he was "hoping for a deal" at an upcoming sentencing hearing and that he had been a "chronic liar."  (State's Lodging A-7, pp. 608, 627.)

Sivak testified in his own defense.  He admitted that he was present at the gas station on April 6 but claimed that Bainbridge was responsible for all of the criminal activity.  (State's Lodging A-9, pp. 879-90.)  He testified that he picked up Bainbridge early that morning, as a favor, to help him exchange an old starter out of a van and that Bainbridge asked to go to the gas station to buy cigarettes.  (State's Lodging A-9, p. 875.)  Once there, he unexpectedly pulled out a handgun and announced, "this is a robbery."  (State's Lodging A-9, p. 879.)  According to Sivak, Bainbridge ordered Wilson to go into the back room, where he hit her in the

---

[2]  Grierson testified as a State's witness at the preliminary hearing, but his testimony concerned earlier statements that Bainbridge supposedly had made, rather than Sivak.

**Memorandum Decision and Order - 7**

back of the head with the gun, stabbed her with a knife, and shot her repeatedly until Sivak heard a clicking sound.  (State's Lodging A-9, pp. 882-86.)

When confronted with his admission that he had stolen the .22 caliber murder weapon from his mother's employer, Sivak said that he had given it to Bainbridge as payment for a small debt a week before the murder.  (State's Lodging A-9, pp. 960-61.)  He also claimed that he was so afraid of Bainbridge that he agreed to store the handgun in his storage shed.  (State's Lodging A-9, pp. 892-93.)

The jury acquitted Sivak of premeditated and deliberate murder (Count II) but convicted him of felony murder (Count III) and robbery (Count I).  It also found that a firearm was used during the commission of the crime.  (State's Lodging A-1, pp. 103-08.)  After an aggravation and mitigation hearing, the trial court sentenced him to death.  Bainbridge was later convicted at his own trial and sentenced by a different judge to life in prison without the possibility of parole.

## STATE POST-CONVICTION PROCEDURAL HISTORY

After an initial remand for resentencing, the judgment was affirmed by the Idaho Supreme Court.  *State v. Sivak*, 674 P.2d 396 (Idaho 1983) (*Sivak I*).  On appeal from the denial of post-conviction relief, however, the Idaho Supreme Court vacated the death sentence based upon the sentencing court's improper restriction

on the presentation of relevant mitigating evidence.  *State v. Sivak*, 731 P.2d 192 (Idaho 1986) (*Sivak II*).  Sivak was resentenced to death in 1988, but the Idaho Supreme Court vacated the death sentence again, finding that the lower court did not correctly weigh the mitigating circumstances against each aggravating factor in accordance with a recent appellate court decision.  *State v. Sivak*, 806 P.2d 413 (Idaho 1990) (*Sivak III*).

In 1992, Sivak was sentenced to death for the final time.  In addition to finding several non-statutory aggravating circumstances, the state district court found that the following statutory circumstances were proven beyond a reasonable doubt:  (1) the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity; (2) Sivak exhibited an utter disregard for the value of human life; (3) the murder was a first-degree felony murder committed during the course of a robbery and accompanied by the specific intent to cause the death of a human being; and (4) by prior conduct and by conduct in the commission of the offense at hand, Sivak exhibited a propensity to murder that will probably constitute a continuing threat to society.  (State's Lodging I-70, pp. 5-6.)

The state court also found several mitigating circumstances, and it weighed those circumstances collectively against each aggravator individually, but it concluded that the mitigation was not sufficiently compelling to make the

**Memorandum Decision and Order - 9**

imposition of a death sentence unjust.  (State's Lodging I-70, p. 66.)

The Idaho Supreme Court affirmed the sentence on appeal.  *State v. Sivak*, 901 P.2d 494 (Idaho 1995) (*Sivak IV*).

## FEDERAL PROCEDURAL HISTORY

In 1996, Sivak initiated federal habeas proceedings.  During court-authorized discovery, Sivak obtained four letters from the trial prosecutor's file that revealed the existence of a possible, previously undisclosed agreement between the State and jailhouse informant Leytham.  The Court then stayed the federal case while Petitioner returned to state court to exhaust claims related to this discovery.  In 2000, the Idaho Supreme Court denied these claims, and the stay was lifted.  *State v. Sivak*, 8 P.3d 636 (Idaho 2000) (*Sivak V*).

This Court dismissed Claims 3, 14, 16, 17, and 19 as procedurally defaulted. (Docket Nos. 170, 279.)  The Court subsequently allowed Sivak to conduct limited civil discovery, which included deposing the trial judge and his court clerk, but denied his request for an evidentiary hearing.  (Docket Nos. 279, 295.)

The parties have now submitted final briefing on the merits of the remaining claims and have presented oral argument.  The Court has fully considered these matters and is prepared to rule.

## GENERAL HABEAS STANDARDS

Because this case was initiated before the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), it is not governed by AEDPA's provisions.  *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

Under pre-AEDPA law, the Court must presume that the state court's findings of historical fact are correct and defer to those findings unless there is convincing evidence to the contrary or a lack of fair support in the record.  28 U.S.C. § 2254(d) (1994); *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001). The Court exercises its independent judgment over questions of federal law and must resolve legal issues on the merits under ordinary rules.  *Summerlin v. Schriro*, 427 F.3d 623, 628-29 (9th Cir. 2005).

## ANALYSIS

## Claim 1:  Bainbridge's Statements

Randy Bainbridge claimed during his pretrial interview with Vaughn Killeen that Sivak was solely responsible for the robbery and murder.  He did not testify at Sivak's trial, and his statements were not before the jury, but a transcript of this interview was attached to the presentence investigation report that was considered by the state court judge at sentencing.

In his first claim for relief, Sivak alleges that these statements provided the

"sole support" for the district court's sentencing finding that "this defendant dominates his co-defendant, and is primarily responsible for all that occurred." (Docket No. 296, pp. 7-8.)  Sivak argues that the court's consideration of this evidence violated his Sixth Amendment right to confront and cross-examine adverse witnesses and his due process right under the Fourteenth Amendment to exclude evidence from sentencing that is "materially false or unreliable."  (Docket No. 314, pp. 59-64.)

Respondent counters, as a threshold matter, that Sivak is seeking relief based on new rules of constitutional law in violation of the non-retroactivity principles announced in *Teague v. Lane*, 489 U.S. 288 (1989).  For the reasons that follow, the Court agrees that to the extent that Sivak relies on the Confrontation Clause, his claim is *Teague*-barred.  The Court further concludes that the evidence was sufficiently reliable to be admitted without violating Sivak's right to due process of law.

1.    Standard of Law

In *Teague*, the United States Supreme Court held that subject to limited exceptions a federal court may not retroactively apply a new constitutional rule in a habeas corpus proceeding.  489 U.S. at 310-11.

To determine whether a claim is barred, the reviewing court must first

Memorandum Decision and Order - 12

ascertain the date on which the petitioner's judgment became final in state court. *Caspari v. Bolhen*, 510 U.S. 383, 390 (1994).  Second, the court must survey "the legal landscape as it then existed" to determine whether existing precedent compelled or dictated a finding that the petitioner's proposed rule was required by the Constitution.  *Lambrix v. Singletary*, 520 U.S. 518, 527 (1997).  If the rule was not dictated by precedent, it is "new" for retroactivity purposes.  *Teague*, 489 U.S. at 307.  The presumption against retroactivity is overcome only if the new rule prohibits "a certain category of punishment for a class of defendants because of their status or offense," *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002), or presents a new "watershed rule of criminal procedure" that enhances accuracy and alters our understanding of bedrock procedural elements essential to the fairness of a particular conviction.  *Teague*, 489 U.S. at 311.

      2.    <u>Date of Finality</u>

      Here, Sivak alleges a constitutional error in the state court sentencing proceeding rather than an error at the guilt or innocence trial that occurred in 1981. Finality for *Teague* purposes "should be measured from the time when the decision under review . . . was actually made."  *Leavitt v. Arave*, 383 F.3d 809, 816-17 (9th Cir. 2004).  The judgment from the 1992 resentencing became final on January 22,

**Memorandum Decision and Order - 13**

1996, the date on which the United States Supreme Court denied the petition for a writ of certiorari. *Sivak v. Idaho*, 516 U.S. 1095 (1996).

      3.    <u>The Legal Landscape</u>

A survey of the landscape as of 1996 reveals that precedent did not dictate a rule that the Due Process Clause of the Fourteenth Amendment incorporated the full complement of criminal trial rights into a capital sentencing proceeding, and it was well-established by that time that a criminal defendant did not have the right to confront and cross-examine all adverse witnesses at such a proceeding.

This state of the law can be traced directly to *Williams v. New York*, 337 U.S. 241 (1949). In *Williams*, a death penalty case, the Supreme Court held that the sentencing judge's consideration of hearsay in a presentence investigation report did not violate a defendant's right to due process of law.

Nearly thirty years later, the Supreme Court took an opportunity to refine the procedural rules governing the admission of evidence at capital sentencing proceedings, but it stopped short of overruling *Williams*. *Gardner v. Florida*, 430 U.S. 349 (1977). In *Gardner*, a majority of the Court concluded that the defendant's right to due process had been violated because his death sentence was imposed, at least in part, on the basis of confidential information in a presentence

investigation report that he had no opportunity to deny or explain.  *Id*. at 362.[3]

The *Gardner* Court acknowledged that the Fourteenth Amendment should be viewed as providing an additional measure of protection to a defendant in the capital sentencing process, but it remarked that "[t]he fact that due process applies does not, of course, implicate the entire panoply of criminal trial procedural rights."  *Id*. at 357, 358 n. 9.  The Court noted that the constitutional infirmity in the case before it was that the sentencing judge had considered secret information; in *Williams*, that particular problem did not exist.  *Id*. at 356.  Thus distinguished, the Court left the general rule from *Williams* intact.

It is true, as Sivak notes, that the Eleventh Circuit later determined that a defendant's right to confrontation extended to sentencing hearings in capital cases, but that decision stood alone.  *See Proffitt v. Wainwright*, 685 F.2d 1227, 1255 (11th Cir. 1982).  For instance, the Ninth Circuit has consistently held that relevant hearsay evidence is admissible at a capital sentencing hearing so long as it is minimally reliable and the defendant has had an opportunity to explain, deny, or rebut the information.  *Creech v. Arave*, 947 F.2d 873, 880-81 (9th Cir. 1991) (*overruled in part on other grounds by Arave v. Creech*, 507 U.S. 463 (1993)); *see*

---

[3]  The main opinion in *Gardner*, relying on the Due Process Clause, was joined by three justices, but seven justices concurred in the result.

**Memorandum Decision and Order - 15**

*also Ortiz v. Stewart,* 149 F.3d 923, 937 (9th Cir. 1999).  The Seventh Circuit reached a similar conclusion, noting that "courts have long sanctioned the use of hearsay at sentencing. [Citations omitted.] There is no exception to this rule in a capital case."  *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1388 (7th Cir. 1994) (en banc).  The Fourth Circuit also rejected *Proffitt*'s reasoning as unsound. *Bassette v. Thompson*, 915 F.2d 932, 939 (4th Cir. 1990).  Therefore, Sivak has not shown that existing precedent dictated that a criminal defendant had a constitutional right to cross-examine adverse witnesses at a capital sentencing hearing.

The more recent cases of *Ring v. Arizona*, 536 U.S. 584 (2002), and *Crawford v. Washington*, 541 U.S. 36 (2004), do not change this conclusion.  In *Ring*, the Supreme Court held that any fact that increases a defendant's maximum sentence from life to death must be found by a jury beyond a reasonable doubt rather than a judge.  536 U.S. at 589.  In *Crawford*, the Court held that hearsay that is "testimonial" in nature is not admissible at a criminal trial unless the witness is unavailable and the defendant has had a prior opportunity for cross-examination. 541 U.S. at 59.

Together, *Ring* and *Crawford* surely mark an evolution in the Supreme Court's traditional interpretation of an accused's rights under the Sixth

**Memorandum Decision and Order - 16**

Amendment.  And when viewed through the lens of the Court's more modern death penalty jurisprudence, these cases may support at least a colorable argument that a right to confrontation *should* apply at least through the factfinding phase of a capital sentencing proceeding.  *See, e.g., United States v. Mills*, 446 F. Supp.2d 1115, 1135 (C.D. Cal. 2006) (holding that *Crawford*'s "protections apply to any proof of any aggravating factor during the penalty phase of a capital proceeding"). But such an argument is inapposite here, as the Supreme Court has already determined that *Ring* and *Crawford* are not retroactive to cases that were final by the time that they were announced.  *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004) (*Ring*); *Whorton v. Bockting*, 127 S.Ct. 1173, 1181-84 (2007) (*Crawford*). In other words, whatever could be said about whether the Confrontation Clause, as interpreted by *Crawford*, applies to the penalty phase of a capital trial taking place today, extending such a rule retroactively to grant relief to a petitioner in a habeas case whose state court judgment became final in 1996 would clearly violate the principles set forth in *Teague*.

Lacking a claim under the Confrontation Clause, Sivak is left with arguing that the trial court's consideration of Bainbridge's hearsay statements violated his right to due process of law because the evidence was materially false and unreliable.

**Memorandum Decision and Order - 17**

4.      The Evidence Was Sufficiently Reliable to be Admissible

Sivak argues that a co-defendant's out-of-court statements placing the blame on another co-defendant are inherently suspect.  The Court does not quarrel with that point as a general matter, but the question is not whether Bainbridge's statements must either be believed in their entirety or excluded altogether.  Instead, the issue is whether the evidence contains some minimal indicia of reliability such that the sentencing court could consider it as but one part of the broad array of information that was before it.  That requirement was met here.

Other independent evidence demonstrated Sivak's motive and opportunity. Witnesses testified that he had previously worked at the gas station and understood how the money was handled and deposited there.  He had been terminated about seven weeks before Wilson was killed, both because of his ongoing conflict with her and because he was considered to be a manipulative and bothersome employee. (State's Lodging A-6, pp. 482-83.)

Sivak had called the station, without identifying himself, before the murder and asked who would be working on the following Monday.  Two witnesses placed both Sivak and Bainbridge at the gas station that morning, minutes before a customer discovered Wilson lying in a back room, bleeding from multiple gunshot and stab wounds.

**Memorandum Decision and Order - 18**

Perhaps most important, Sivak was tied directly to the murder weapon; the handgun that was used in the attack was found hidden among his personal items in a storage shed rented by him.  At trial, he admitted that he had stolen the gun from his mother's employer, and his fingerprint was on the barrel when it was discovered.  Last, but certainly not least, Jimmy Leytham and Duane Grierson testified that Sivak had confessed to killing Wilson.

In addition to the evidence that was presented at the trial, other information was before the court at sentencing that supported the court's findings relative to Sivak's role in the crime.  Much of this evidence came from one of Sivak's own witnesses at the 1988 sentencing hearing, Dr. Raymond Morgan.

Morgan testified that after giving a polygraph examination to Bainbridge, he concluded that Bainbridge was being deceptive about the extent of his involvement, including such matters as whether he intended to rob the gas station before arriving there and whether he stabbed Wilson during the crime.  Sivak offered this evidence in an attempt to prove that Bainbridge was more culpable than the trial court had originally believed, but Morgan also testified that Bainbridge was *not* being deceptive when he insisted that he did not shoot Wilson. (State's Lodging G-58, p. 28.)  More critically, Morgan's psychological testing indicated that Bainbridge was "slow mentally," had "strong needs for acceptance,"

**Memorandum Decision and Order - 19**

and while he "very much would like to be a leader, [he] doesn't have the intellectual functioning to do that."  (State's Lodging G-58, pp. 32-33.)

This description of Bainbridge's personality and mental functioning was confirmed by Dr. Jean Gardiner's deposition testimony, which was submitted to the trial court as an addendum to the original presentence investigation report. (State's Lodging A-20.)  Dr. Gardiner, a psychologist who had treated Bainbridge for several years, testified that his intelligence was in the "dull normal" range and that he was "hyper-suggestible to the influence of others."  (State's Lodging A-20, pp. 10-11.)  She held the opinion that Bainbridge was a follower who was impulsive and eager to please.  (State's Lodging A-20, p. 12.)

All of these facts lend sufficient minimal corroborating support to Bainbridge's statements to make them admissible at sentencing.  Furthermore, Sivak cannot be heard to complain that he did not have an opportunity to rebut, explain, or deny the evidence.  *See Gardner*, 430 U.S. at 362.  A transcript the interview was attached to the original presentencing report in 1981, and Sivak was last sentenced to death in 1992.  He had several opportunities during that time to address the evidence; indeed, he spent much of the 1988 hearing attempting to heighten Bainbridge's culpability and reduce his own.  (State's Lodging G-59, pp. 202-03.)

**Memorandum Decision and Order - 20**

5.      Lack of Prejudice

For similar reasons, if an error occurred, it cannot serve as a basis for upsetting the state court's judgment.  The substantial and competent evidence recited above also supported the trial court's findings.  Sivak has not proven that any error had "a substantial and injurious effect" on the court's decision to impose a death sentence in this case.  *See Fry v. Pliler*, 127 S.Ct. 2321, 2328 (2006).

## Claim 2:  Alleged *Brady* Violation Based on the Leytham Letters

In his second claim for relief, Sivak alleges that the prosecution failed to disclose that it had an agreement with Jimmy Leytham in exchange for his testimony.  In support, he relies on the four letters that he discovered in the prosecutor's file.  Taken together, these letters tend to show that the prosecution provided benefits to Leytham in the form of recommendations of leniency on other pending charges and in parole matters.  Two of the letters also indicate that Leytham was seeking to be paid.  Sivak argues that this information was impeachment material that should have been turned over to the defense in advance of trial under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

While the Court agrees that the State should have disclosed the letters, it does not find a basis for granting habeas relief for two reasons:  (1) the material information in the letters was already known to the defense before trial; and (2)

given the largely cumulative nature of the evidence, it would not have been

material to guilt or punishment.

<u>Background</u>

1.    <u>Disclosures Before Trial</u>

On May 1, 1981, Leytham testified at the preliminary hearing about Sivak's

incriminating statements.  (State's Lodging  Aa, pp. 230-32.)  On cross-

examination, he revealed much of his criminal history.  He admitted the he had

received a prison sentence for a burglary conviction and that an escape charge was

still pending against him in another county.  (State's Lodging Aa, pp. 241-42, 244.)

He conceded that he also had other convictions for burglary and for passing a

check with insufficient funds.  (State's Lodging, Aa, pp. 244-45.)

Still two months before trial, Vaughn Killeen testified at a pretrial hearing

that Leytham had recently been paroled from prison.  (State's Lodging A-15, p.

18.)  Killeen also stated that Leytham was "demanding money for testimony at

trial, and . . . doesn't wish to testify unless we pay him money."  (State's Lodging

A-15, p. 18.)

Leytham's deposition was taken on August 12, 1981.  Prosecutor Harris

questioned him briefly about the benefits that he had received, and he admitted that

his escape charge had been dismissed and that a burglary charge may eventually be

dismissed because of his cooperation in this case.  (State's Lodging A-18, pp. 10-11.)  In a lengthy cross-examination, Leytham disclosed that the prosecutor had also "put a recommendation in to the pen for parole."  Though he continued to insist that he did not expect anything, he conceded that Harris had told him after the preliminary hearing that the State was trying to "do something" for him.  He also testified that he had been transferred to Kansas for a period of time, but he would not say why.  (State's Lodging A-18, pp. 12-32.)

In September 1981, Leytham testified at the jury trial.  This time, when Harris questioned him about his motivation for coming forward, he claimed that he was worried about his "wife and kids out on the streets."  (State's Lodging A-7, p. 535.)  When Harris asked him if he had requested "any particular thing – any particular favoritism from State authorities with regard to your willingness to testify in this case," he responded that he had not.  (State's Lodging A-7, p. 536.)  He did admit that two charges had been dismissed after he became involved in this case:

> Q.    Well, did my office or any other State agency do anything for you with regard to your incarceration of [sic] the Ada County Jail?
>
> A.    After the preliminary hearing my escape got dismissed for me.
>
> Q.    Okay.  Anything else?

**Memorandum Decision and Order - 23**

A.     I had a charge pending at Twin Falls, and that was dismissed, too.

Q.     Do you know whether or not my office had anything to do with that?

A.     I don't know.

Q.     Anything else that you were given at that time?

A.     No .

(State's Lodging A-7, p. 536.)

On cross-examination, defense counsel exposed Leytham's criminal history, inquiring about every crime he had apparently ever been charged with.  Counsel underscored how Leytham had committed a series of felonies in a short period of time and yet had subsequently been paroled from prison.  (State's Lodging A-7, p. 549.)  Counsel also questioned Leytham about his assertion that other another county jail inmate named Nathan Crispin had coincidently "confessed" his crime, and counsel implied that Leytham was testifying as a State's witness against Crispin in a murder trial in Kansas.  (State's Lodging A-7, pp. 565-66.)  He closed his cross-examination by suggesting that Leytham was "a free man today" because he had testified in this case and in Crispin's case.  (State's Lodging A-7, p. 579.)

2.     The Letters

The four letters that Sivak contends comprise undisclosed *Brady* material surfaced in 1996.  Two letters, both dated within days of the May 1981 preliminary

hearing, were written by Harris.

On May 7, Harris wrote to the Idaho County Prosecuting Attorney and requested that the escape charge be dismissed on account of Leytham's cooperation in this and two other murder cases.  (Docket No. 296, Exhibit C.)  Five days later, on May 12, Harris wrote to the Chairman of the Idaho Commission of Pardons and Parole, requesting that the Commission give Leytham "additional consideration" at his upcoming parole hearing based upon his cooperation with law enforcement in the Wilson murder case and the Kansas murder case (presumably involving Crispin).  (Docket No. 296, Exhibit D.)

Another letter, dated July 13, appears to have been authored by Leytham himself.  In that letter, which was sent to a Kansas official, Leytham wrote that Idaho authorities "say they will help me when I get out but don't do anything about it."  Leytham warned that if he did not receive $6,000 for his testimony, he would "stop what [he is] doing" and tell Crispin to take the case to trial.   (Docket No. 296, Exhibit A.)

Finally, in response to Leytham's letter, Killeen wrote to Leytham on July 27.  He reminded Leytham what "this office has done in regards to your current status," indicating that after Leytham approached state officials seeking a "deal," Killeen told him that while the State could not make deals he would try to do

**Memorandum Decision and Order - 25**

"something" for Leytham, but there "would be no guarantees."  Killeen then

recounted how "members of this office were able to make certain arrangements for

you . . . specifically; the dismissing of criminal charges against you in two

jurisdictions, a reduction in sentence and a parole from the Idaho State

Correctional Institute."  Killeen discussed Leytham's requests for payment,

warning him that this "amounts to an extortion."  He concluded that Leytham

should "stop trying to make a living off of the system" and that a copy of the letter

would be sent to his parole officer.  (Docket No. 296, Exhibit B.)

Sivak alleges that these four letters show that "prosecution withheld

evidence that Leytham had testified against Mr. Sivak as part of a specific

agreement, an agreement which was not disclosed to Mr. Sivak's trial or post-

conviction counsel.  The prosecution also withheld evidence that Leytham had

asked for money in exchange for his testimony and was in fact 'making a living off

the system,' and had approached authorities about a 'deal.'  (Docket No. 296, p.

13.)

<u>Standard of Law</u>

It is a violation of due process of law when the prosecution withholds

exculpatory or impeachment evidence from the defense that is material to guilt or

punishment.  *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473

U.S. 667, 676 (1985).  A *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused, either because it is impeaching or exculpatory; (2) the prosecution must have withheld the evidence, either intentionally or inadvertently; and (3) the evidence must be material to guilt or punishment.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Evidence is material to guilt or punishment when there is a reasonable probability that the outcome would have been different had the evidence been disclosed.  *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995); *Bagley*, 473 U.S. at 676. The prosecution's suppression of favorable evidence is prejudicial when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Banks v. Dretke*, 540 U.S. 668, 698 (2004).  In assessing materiality, a reviewing court must accumulate all of the withheld exculpatory evidence to determine the net effect on the defendant's right to a fair trial.  *Kyles*, 514 U.S. at 436-37.

<u>Discussion</u>

There can be little doubt that the newly discovered letters contain evidence that is favorable to Sivak.  Leytham portrayed himself as a Good Samaritan who was testifying out of a sense civic duty and a desire to protect his family.  He insisted that he did not ask for any benefits for his cooperation.  The letters show

that he was instead a jailhouse informant who actively sought favors in this and other criminal matters and that the State had in fact provided benefits to him.  It is equally clear that the State suppressed the letters because they were not disclosed until the Court granted discovery in this habeas matter.  Regardless, the defense was actually aware of most of the *factual information* in the letters long before trial.

As early as July 1981 Sivak learned through Killeen's testimony at the pretrial hearing that Leytham was an uncooperative witness who was seeking to be paid. After the August 12 deposition, Sivak also knew that Harris had a hand in the dismissal of the escape charge in Idaho County and had "put a recommendation to the pen for parole."  It appeared at that time that a burglary charge in Twin Falls would also be dismissed.  Leytham testified that Harris had personally told him after the preliminary hearing that he would try to "do something" for him.  At trial, Leytham admitted yet again that the escape and burglary charges had been dismissed and that he was on parole, though neither he nor Harris volunteered that the prosecutor helped to obtain his release on parole.

The undisclosed letters may place these basic facts in a more specific and detailed context, but they do not add much substance to that which the defense already knew.  Indeed, the benefits that are shown in the two Harris letters–the

**Memorandum Decision and Order - 28**

dismissal of an escape charge and assistance in getting parole–were clearly known to the defense at least by the August 12 deposition.

More troubling to the Court is the State's failure to disclose the letter that was written by Leytham himself and Killeen's response.  Leytham's attempts to receive payment for his testimony, and his threat of non-compliance unless he were paid, were directly inconsistent with his repeated assertions that he was motivated to come forward solely by altruistic reasons.  Yet the defense was already on notice from Killeen's July 24 testimony that Leytham was uncooperative and wanted to be paid.  For whatever reason, defense counsel chose not to cross-examine Leytham about this matter at trial.  Had counsel questioned him on that point, and had he denied it, then Killeen could have presumably testified for the defense as an impeachment witness.  The essence of a *Brady* violation is the suppression of materially favorable evidence; here, the material information was known.  When a defendant knows the salient facts that comprise the alleged *Brady* material such that he could use the information effectively in his defense, it cannot be said that his due process right to a fair trial has been violated.  *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (citations omitted); *Lambert v. Blackwell*, 387 F.3d 210, 265 (3d Cir. 2005); *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004).

More importantly, Sivak has not convinced the Court that there is reasonable

probability of a different outcome had the letters been disclosed.  *Kyles v. Whitley*,

514 U.S. 419, 433-34 (1995).  The primary benefits that Leytham had already

received from the State, in addition to his status as a ex-convict who regularly

committed crimes of dishonesty, were simply not secrets in this case.

Leytham's oft-repeated denials that he neither sought nor expected anything

of value stood in stark contrast to the facts in front of the jury.  After the

prosecutor's direct examination, the jury was well aware that the escape charge,

and perhaps a burglary charge, had been dismissed as "consideration" for

Leytham's cooperation, and it also knew that he had recently been paroled from

prison.  (State's Lodging A-7, pp. 535-36.)  Defense counsel then ably cross-

examined him about his entire criminal history, pointing out that he had the

remarkable good fortune of getting out from under a potentially lengthy stay in

prison after he decided to come forward with information in this case and the

Crispin case.  Counsel also tested the believability of Leytham's claim that Sivak

confessed to him during the few hours that they shared on the same tier.

This impeachment continued during the defense's case-in-chief when a

former county jail inmate testified that to Leytham's poor reputation among the

inmates.  He claimed that Leytham "felt by testifying against other people that had

serious felonies, that he would cut his time down."  (State's Lodging A-9, p. 1031.)

**Memorandum Decision and Order - 30**

During his closing argument, the prosecutor implicitly acknowledged the damage that the defense had done.  Although he argued that Leytham and Grierson's claims were believable because they testified about matters that they could not have known unless Sivak told them, he also noted that "[i]t doesn't bother me or particularly matter to me whether you believe those two less-than gentlemen or not."  (State's Lodging E-45, pp. 30-31.)

Given the obvious benefits that Leytham had received and the pounding his character had taken from the defense, his assertion that he did not expect anything in return for testifying was not credible, and the presentation of additional impeachment material would have done little to further that point.  Laid on top of Leytham's shaky credibility is the otherwise overwhelming evidence of Sivak's guilt, including that which connected him to the gas station, Dixie Wilson, and the handgun that was used to kill her.  To the extent that some impeachment evidence may not have been disclosed, it would not have been material to the jury's verdict.

Nor has Sivak has established that had an objective sentencing factfinder been aware of the Leytham letters, there is a reasonable probability that it would have tipped the balance toward life.  In its findings in support of the death sentence, the state court did not expressly rely on Leytham's testimony as a basis for any of the aggravating circumstances.  (State's Lodging I-70, pp. 60-66.)  And

**Memorandum Decision and Order - 31**

though the court's decision to impose a death sentence appears to have been influenced by its view that Sivak was the more dominant actor, Sivak has not shown that this view was shaped to any appreciable degree by Leytham's testimony; as the Court addressed with respect to Claim 1, other substantial and competent evidence supported that finding. *See Strickler v. Greene,* 527 U.S. 263, 295 (1999) (the withheld evidence "did not relate to [the defendant's] eligibility for the death sentence and was not relied upon by the prosecution at all during its closing argument at the penalty phase").

That is not to say that this Court condones the State's hide-the-ball tactics in this case. Instead of disclosing all of the favorable material in an open and timely fashion, the prosecutor let it trickle out in bits and pieces. The focus under *Brady* is on the prosecution's duty to reveal all exculpatory or impeachment evidence, not on defense counsel's efforts to scorch the earth for such material, especially after the prosecution has indicated that it has complied with its *Brady* obligations. *Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("[a] rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process"). Harris compounded the initial error by continuing to be evasive and misleading during his testimony at the first post-conviction hearing, and his successors did not disclose the letters until ordered to

do so in this proceeding.  The State has created an issue that would not have existed had it been more forthcoming early on about Leytham's status as a jailhouse snitch who wanted favors in exchange for his testimony.

But while the Court does not approve of the State's tactics, the undisclosed evidence simply does not put the whole case in such a different light as to undermine the Court's confidence in the jury's verdict or in the death sentence. *Banks*, 540 U.S. at 698.  For the reasons given, Sivak has not shown a prejudicial *Brady* violation.  This is still true even after the Court adds into the mix the evidence that Sivak alleges was withheld in Claim 4, as discussed below.

## Claim 3:  The *Napue* Claim

In a related claim, Sivak alleges that his right to due process was violated under *Napue v. Illinois,* 360 U.S. 264, 269 (1959), when the prosecutor failed to correct Leytham's false testimony.

To prevail on a *Napue* claim, the petitioner must establish that (1) the testimony was actually false, (2) the prosecution knew or should have known that the testimony was false, and (3) the false testimony was material.  *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006).  Unlike the materiality/prejudice standard for *Brady* claims, which requires a reasonable probability of a different outcome, evidence is material under *Napue* when "there is any reasonable likelihood that the

**Memorandum Decision and Order - 33**

false testimony *could have* affected the judgment of the jury." *Id*. (emphasis added).

The Court previously concluded that this claim was procedurally defaulted, and while Sivak had shown "cause" for the default, he had not shown prejudice. (Docket No. 170, p. 24.)  The claim was dismissed on that basis.

In his merits briefing, Sivak asks the Court to reconsider that ruling on two grounds.  First, he argues that *Napue* falls under the same constitutional umbrella as *Brady*, and if a *Brady* claim is properly exhausted, as here, then a *Napue* claim must have necessarily been properly exhausted at the same time.  Second, he asserts that this Court and the Idaho Supreme Court erred in finding that he had not expressly relied on *Napue* during his original post-conviction appeal.

Despite Sivak's confidence that *Napue* and *Brady* are really two sides of the same constitutional coin, the United States Supreme Court has not yet resolved whether these issues must be raised and argued separately.  *See Banks v. Dretke*, 540 U.S. 668, 690 n.11 (2004) ("we need not decide whether [these claims], to warrant adjudication, must be separately pleaded").  Moreover, in response to Sivak's alternative claim that he exhausted the issue during the initial post-conviction appeal, Respondent argues with some force that the claim is now fundamentally different, an argument that Sivak seems to have conceded earlier in

this case.  The Court sees no reason to resolve these disputes because it reaffirms that the alleged false testimony was not material to guilt or punishment.  (Docket No. 170, pp. 24-25; Docket No. 179, pp. 6-7.)

The testimony at issue is Leytham's claim that he did not expect anything from the State in exchange for his cooperation.  Perhaps to a lesser degree, the prosecutor did not correct the impression left by Leytham's direct testimony that his release on parole was fortuitous coincidence that was unconnected to his assistance in this case.[4]

When viewed in context of Leytham's known criminal record and the benefits that he had received, these aspects of his testimony were not believable.  Also, aside from Leytham's testimony, the State presented strong evidence of Sivak's active involvement in the robbery and murder.  Although the burden for showing materiality under the *Napue* line of cases is arguably less onerous than for a *Brady* claim, the Court nevertheless concludes that there is no reasonable likelihood that Leytham's implausible claim that he testified out of the goodness of his own heart could have affected the judgment of the jury or the court in passing sentence.  Because Sivak cannot show materiality under a merits-based analysis,

---

[4]  Notably, the false testimony is *not* Leytham's assertion that Sivak made incriminating statements to him.  Sivak has no new evidence that this aspect of his testimony is false, only an argument that it should not be believed because Leytham lied about other matters

**Memorandum Decision and Order - 35**

the Court need not re-examine whether a greater showing of harm is necessary to

excuse a defaulted *Napue* claim under a cause and prejudice analysis. *Cf. Strickler*

*v. Greene,* 527 U.S. 263, 282 (1999) (holding that prejudice from a defaulted

*Brady* claim is established when the evidence is material to guilt or punishment).

Support for the Court's conclusion can be found in *Hovey v. Ayers*, 458 F.3d

892, 916 (9th Cir. 2006).  The Ninth Circuit concluded in *Hovey* that there was no

reasonable likelihood that a jailhouse informant's false testimony could have

affected the verdict because the "jurors heard ample evidence about [the

informant's] criminal record and his pending burglary charges . . . [h]is hope of

receiving lenient treatment in exchange for his testimony against Hovey was no

secret." *Id*. at 921.  This is equally true here; Leytham's criminal history, the

dismissal of charges against him, and his release from prison in the face of a

lengthy criminal record were already laid before the jury.

Conversely, the Court is not persuaded by Sivak's argument that the result

should be controlled by *Jackson v. Brown*, 2008 WL 185528 (9th Cir. 2008).  In

*Jackson*, also a capital case, the Ninth Circuit held that false testimony from two

inmate informants about favors and inducements to testify was material to the

sentencing outcome.  The jury in that case, however, heard almost nothing about

the benefits that had been promised or provided, and the difference between what

**Memorandum Decision and Order - 36**

was revealed and what was hidden was far greater in *Jackson* than either this case or *Hovey*. *Id*. at *15-16. Also in contrast to the present case, the evidence supporting the aggravating circumstances in *Jackson* relied heavily on the informants' testimonies. *Id*. at *17.

The Court's overriding concern is whether both the verdict and sentencing result are worthy of confidence. The Court still has such confidence. Because Sivak cannot establish prejudice, he would not be entitled to reconsideration of the dismissal of this claim or relief on the merits.

## Claim 4:  Alleged *Brady* Violation Based on the Fazio Evidence

For another *Brady* issue, Sivak next contends that the State withheld Randy Bainbridge's comments to another inmate, Louis Fazio, in which Bainbridge allegedly said that he had touched the victim's breasts as she was dying.

Sivak's only allegation of prejudice in his Petition is that Bainbridge's statement to Fazio would have contradicted his pretrial interview with Vaughn Killeen, which was considered at sentencing.  (Docket No. 296, pp. 16-17.)  As the Court noted in a previous Order and again at oral argument, Sivak's counsel possessed this evidence before the 1988 sentencing hearing, and there can be no *Brady* violation with respect to punishment because it cannot be said that the evidence was suppressed or withheld by the last sentencing hearing.  To the

contrary, counsel referred to it as part of Sivak's mitigation case.  (State's Lodging G-59, pp. 198-200; State's Lodging I-72, p. 169.)

Sivak argues in his briefing that this evidence would have also been exculpatory as to guilt or innocence.  The Court disagrees.  Initially, Sivak has not demonstrated in a persuasive manner how the statement would have been presented at his trial unless Bainbridge testified and admitted that he fondled the victim's breasts or that he told Fazio that he had, a scenario that seems exceptionally unlikely.  If he had been called as a witness and invoked his Fifth Amendment privilege not to testify, his out of court statements would have been hearsay and presumptively inadmissible.  *See* Idaho Rule of Evidence 802.  Information that a jury would never hear cannot be material or prejudicial for *Brady* purposes because, by definition, there is no possibility of a different outcome.  *See United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989) (citing *United States v. Ranney*, 719 F.2d 1183, 1190 (1st Cir.1983)).  Sivak's argument that the evidence would have been admitted as a statement against Bainbridge's penal interest under Idaho Rule of Evidence 804(b)(3) is speculative.

Even if admissible, the evidence would have been only minimally favorable and ultimately not material to the jury's verdict.  The jury found Sivak guilty of felony murder, meaning that it found beyond a reasonable doubt that he was at

least an intentional participant or accomplice in the robbery during which Dixie Wilson was killed.  The evidence showed fairly conclusively that *both* Sivak *and* Bainbridge were involved in these crimes.  Additional evidence that Bainbridge may have told another inmate, whose credibility is entirely unknown, that he had touched the victim's breasts as she lay dying would not cast doubt on Sivak's guilt.

To the extent that it is necessary to accumulate this evidence with the Leytham letters to assess the collective impact on Sivak's right to a fair trial, *see Kyles*, 514 U.S. at 436-37, the Court's conclusion remains unchanged.  Given the overwhelming evidence of his involvement in this offense, there is no reasonable probability of a different outcome had the prosecution disclosed the statement to Fazio–which was, at best, minimally favorable–in addition to the largely cumulative letters related to Leytham.

### Claims 5 and 6:  Allegations of *Ex-parte* Contact and Judicial Bias

Judge Robert Newhouse presided over Sivak's trial and the ensuing capital sentencing proceedings in 1981, 1983, 1988, and 1992.  In Claim 5 of Sivak's Second Amended Petition, he contends that Judge Newhouse considered "extra-record communications concerning the appropriate sentence" that were not disclosed to the defense.  In Claim 6, Sivak alleges that he was deprived of a fair sentencing proceeding in front of an impartial judge.  He bases Claim 6, in part,

upon the judge's response to his counsel's initial inquiries into the alleged
consideration of outside contact.

<u>Background</u>

These claims have their genesis in an interview that Judge Newhouse gave to
a local newspaper reporter in early 1982, after he had sentenced Sivak to death the
first time but while the case was pending on appeal.  The reporter quoted the judge
as saying that he "received a lot of telephone calls and letters before and after" he
sentenced Sivak.  (State's Lodging E-35, p. 38, Exhibit A.)  Judge Newhouse later
denied Sivak's request to question him under oath regarding the alleged calls and
letters, though he stated that he had not been influenced by any outside
communication.  (State's Lodging E-47, pp. 44, 66.)

On appeal, the Idaho Supreme Court declared that it was confident that
Judge Newhouse did not rely upon any outside information, but because the case
was going to be remanded for resentencing anyway, it instructed the judge to "clear
the air completely and state on the record what the factual content of those phone
calls and letters were."  *Sivak II*, 731 P.2d at 200-01.  The judge responded by
executing a document that he labeled "On the Record," in which he asserted that
his court clerk had screened all letters and calls before the original sentencing
hearing, and that he had neither personally read any letters nor received any calls

from the public before he sentenced Sivak.  In that same document, he expressed

his extreme displeasure with counsel for raising the issue:

> It is sad that innuendos of a partisan and personal nature fabricated by
> over-zealous counsel should result in a judge being personally castigated
> in his own court.
>
> \* \* \*
>
> Should this carnival atmosphere continue in these capital cases, and
> should a man's integrity be questioned without any reason whatsoever
> when doing his job, no judge will impose death sentences in Idaho, and
> I can't blame them! Such an action by judges will certainly thwart the
> will of the public as represented by the Idaho Legislature.

(State's Lodging H-66.)

Sivak's counsel again requested that the judge disqualify himself from the

case, this time for bias.  Another state district court judge reviewed the record and

did not find a basis for disqualification, but concluded that only Judge Newhouse

could make the final decision whether he harbored a bias against Sivak or his

counsel.  (State's Lodging I-70.)  Judge Newhouse denied Sivak's renewed request

for disqualification, a decision that was affirmed on appeal.  *Sivak IV*, 901 P.2d at

496.

This Court allowed Sivak to depose Judge Newhouse and his court clerk as

part of discovery in this habeas proceeding.  At his deposition, Judge Newhouse

once again denied that he had been exposed to "a lot of calls and letters" from the

public.  He claimed that any contact that came to his chambers would have been diverted to his presentence investigator.  His court clerk confirmed that information pertaining to sentencing would generally have gone through the presentence investigator.

Judge Newhouse did admit to some different contacts, including one involving Sivak's father, Michael Sivak, in which the elder Sivak came to the judge's chambers and asked, "why the hell don't you kill the son of bitch?"  The judge also testified that at some point during the lengthy period that the case was pending in the state courts he spoke to an official at Baird Oil; that person said that he was initially opposed to the death penalty but that the Sivak case had made him change his mind.  Similarly, Judge Newhouse claimed that his courtroom clerk told him that her views on the death penalty had changed because of the Sivak case.  Finally, he admitted that he overheard courthouse gossip and rumors about Lacey Sivak through the years, which included claims that Sivak and his mother had an unnatural sexual relationship.

1.   *Gardner* Error

In Claim 5, Sivak contends that Judge Newhouse considered "extra-record information," without disclosing that information to trial counsel before sentencing Sivak to death, violating his right to a fair and reliable capital sentencing hearing

**Memorandum Decision and Order - 42**

under the Eighth and Fourteenth Amendments.  To support this claim, he relies

heavily on *Gardner v. Florida*, 430 U.S. 349 (1977).

In *Gardner*, after finding the defendant guilty, the jury recommended to the

trial court that he not be sentenced to death.  *Id*. at 352.  After receiving a

presentence investigation report, a portion of which was not disclosed to the

defense, the trial court disregarded the jury's recommendation and imposed a death

sentence.  *Id*. at 351-52.  On appeal, a the United States Supreme Court concluded

that the defendant's right to due process of law was violated because "the death

sentence was imposed, at least in part, on the basis of information which he had no

opportunity to explain or deny."  *Id*. at 362.

Sivak argues that a federal court is free to upset a state court judgment in

habeas after finding that the sentencing judge was merely exposed to extra-record

information, without regard to whether the information contributed to the judge's

sentencing decision.  (Docket No. 314, p. 44.)  This position appears to be at odds

with *Gardner* itself.  Though it is true, as Sivak asserts, that the Supreme Court

indicated that it "had no means of determining on review what role [the]

confidential information played in the judge's sentence," 430 U.S. at 354, there

was no dispute that the trial judge had actually considered undisclosed information

before imposing a death sentence, because he said that he had.  *Id*. at 351.

**Memorandum Decision and Order - 43**

Furthermore, the Supreme Court concluded that a constitutional violation occurs when a "death sentence *was imposed,* at least in part*, on the basis of* information that the defendant had no opportunity to explain or deny," 430 U.S. at 362 (emphasis added). Sivak's position would seem to read out the requirement that the death sentence be "imposed, at least in part, on the basis of" secret information.

A similar argument was raised in *McKenzie v. McCormick*, 27 F.3d 1415 1420 (9th Cir. 1994). There, the petitioner claimed that once he had shown that the trial prosecutor had met with the sentencing judge in an off-the-record meeting, prejudice must be presumed and the burden shifts to the state to prove that no relevant matters were discussed. Chief Judge Kozinski, writing for the majority, noted that "*Gardner* does not support this novel rule, and the principles of federalism, comity, and finality counsel against it." *Id*. Integral to the Ninth Circuit's conclusion was the presumption of regularity and finality that attaches to a state court's judgment in a federal habeas proceeding. In such a proceeding, the burden is on the petitioner to prove that a harmful constitutional error occurred. Likewise, the Seventh Circuit has noted that "merely being aware of the contents of the *ex parte* information is not sufficient to raise a constitutional error." *Ashford v. Gilmore*, 167 F.3d 1130, 1136 (7th Cir. 1999).

At any rate, *Gardner* does not help Sivak because he is unable to show that

**Memorandum Decision and Order - 44**

the trial court sentenced him to death, even in part, "on the basis of information that [he] had no opportunity to explain or deny."

The Court need not spend much time on Sivak's generic claim that the state court judge personally received "a lot of telephone calls and letters" before he sentenced Sivak to death.  Despite years of investigation, and after having the benefit of discovery, Sivak has been unable to substantiate this allegation.  Distilled to its essence, the claim is based on an off-hand comment that the judge made to a newspaper reporter over twenty-five years ago.  The judge has consistently denied that he had such widespread contact with the public, and Sivak has come forward with no evidence to the contrary.

The Court is also not excessively concerned by the judge's exposure to vague courthouse gossip through the years, or his supposed discussion with his court clerk about her views on the death penalty, as these are not the type of material outside contacts about which *Gardner* was concerned.  This Court agrees with the Idaho Supreme Court that "judges do no live in a sterile environment" and that "judges are capable of disregarding that which should be disregarded."  *Sivak II*, 731 P.2d at 200 (citing *Ford v. Strickland*, 696 F.2d 804, 811 (11th Cir. 1983).  Likewise, the Court finds that the brief telephone conversation between the judge and an unknown person who worked for Baird Oil at some undefined point in time

**Memorandum Decision and Order - 45**

was *de minimis*.  None of this information was included within Judge Newhouse's findings in support of the death sentence.  *See Ashford*, 167 F.3d at1136 ("the judge stated his reasons for imposing the death penalty, and the [*ex parte*] security memo was not one of them").

By far the most troubling matter is Michael Sivak's exhortation to the judge in his chambers that the he should "kill the son-of-a-bitch."  In the abstract, a father's off-the-record recommendation that his own son should be executed would be problematic.  But the record clearly establishes that Michael Sivak's antagonism toward his son, and indeed this very incident, was known to the defense by the time of the last sentencing hearing.

At the 1988 hearing, Sivak's mother and sister provided wide-ranging evidence in mitigation about Michael Sivak's abusive and neglectful relationship with his children.  (State's Lodging G-58, pp. 64-90; State's Lodging G-59, pp. 129-153.)  Particularly relevant is the testimony of Sivak's sister, Laurie Fulton, which was taken by deposition and read into the record.  Defense counsel led Fulton through a series of questions, one of which was, "have you talked to you dad about what he thinks ought to happen to Lacey," to which she responded that "he did talk to Judge Newhouse and he asked to have Lacey killed."  (State's Lodging G-58, p. 77.)  She testified that "[h]e called me right after he did it, to my

home in Connecticut, and he bragged about it and says that he wanted Lacey killed, because he was just taking up room on this earth."  (State's Lodging G-58, p. 77.)

Unlike *Gardner*, then, Sivak had an opportunity to meet this information directly.  Presumably one of the purposes in presenting the testimony of family members was to paint Michael Sivak as a mean-spirited alcoholic who dominated and abused his son during his formative years.  Defense counsel likely offered Fulton's testimony about the specific exchange between Michael Sivak and the judge to underscore that only an exceptionally cold-hearted person would lobby for his child's execution.  That strategy may have worked to a degree; at his deposition, Judge Newhouse testified that he viewed Michael Sivak as "explosive" (Newhouse Depo., pp. 69), and it is doubtful that he placed any weight on the opinion of such a person.

Although it appears that Judge Newhouse could have been more diligent in insulating himself from outside contact related to this case through the years, Sivak has failed to demonstrate an error of constitutional magnitude that requires the issuance of the writ.

2.    Biased Judge

In related Claim 6, Sivak contends that Judge Newhouse was not an impartial decision-maker by the last sentencing hearing, both because of his

**Memorandum Decision and Order - 47**

comments after defense counsel raised the issue of outside communication and because he allegedly "refused to complete a proper sentencing proceeding following each remand."  (Docket No. 314, p. 52.)

A fair proceeding in front of an impartial judge is a basic component of due process under the Fourteenth Amendment.  *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821-22 (1986); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).  "Fairness requires the absence of actual bias in the trial of a case."  *In re Murchison*, 349 U.S. 133, 136 (1955).

However, not every situation appropriate for judicial disqualification would be a due process violation were that judge to hear the case.  *Lavoie*, 475 U.S. at 828.  Questions concerning a judge's qualifications to preside over a case "are, in most cases, answered by common law, statute, or the professional standards of the bench and bar," not the Due Process Clause.  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  To succeed on a judicial bias claim, a petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators."  *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

A few matters can be set aside quickly.  Clearly, Judge Newhouse did not have "a direct, personal, [and] substantial pecuniary interest in reaching a conclusion against [Sivak]," *Tumey*, 273 U.S. at 523, nor did he take on the role of

**Memorandum Decision and Order - 48**

a prosecutor acting "as part of the accusatory process," *In re Murchison*, 349 U.S. at 137.  Sivak instead contends that the judge's comments about matters related to the 1982 newspaper article show that he had become so personally embroiled in a dispute with defense counsel that he could not render a fair judgment.  *See Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971) (holding that a trial judge should have been disqualified from presiding at a contempt proceeding after the contemnor had leveled "highly personal aspersions" against him); *see also Offut v. United States*, 348 U.S. 11, 14 (1954) ("justice must satisfy the appearance of justice").

Undoubtedly, some of Judge Newhouse's statements were intemperate.  When he was subpoened to testify about the matter, he likened the proceeding to a "Roman circus."  (State's Lodging E-47, p. 66.)  And after the Idaho Supreme Court asked him to "clear the air" and to clarify the issue on the record, he executed a document that he labeled, apparently derisively, "On the Record," accusing "over-zealous counsel" of "fabricating" allegations of *ex parte* contact and creating a "carnival atmosphere" in the process.  (State's Lodging H-66.)  In this Court's view, defense counsel was raising legitimate concerns that can be traced to the judge's questionable decision to grant a media interview about his handling of death penalty cases while one of those cases was pending on appeal.

**Memorandum Decision and Order - 49**

Rather than concede that this choice was perhaps a mistake and lay out the facts surrounding the "calls and letters" dispassionately, the judge dug in his heels and asserted a defensive posture.

Even so, the presumption of regularity and impartiality presents a formidable barrier.  Unfavorable rulings will almost never support a finding of bias, and a judge's use of language that evidences displeasure or anger rarely fares much better.  The Supreme Court has specifically indicated that remarks "that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or impartiality challenge."  *Liteky v. United States*, 510 U.S. 540, 555 (1994).  This holds true here as well.

Judge Newhouse directed his comments at what he perceived to be overreaching by defense counsel, and he claimed that he harbored no ill will toward Sivak himself arising from counsel's conduct.  Moreover, this dispute was over a single, though not unimportant, issue that blends into the otherwise voluminous record that includes dozens of post-trial hearings spanning over a decade, resulting in thousands of pages in the clerk's record.  The degree of hostility reflected in the few harsh comments in the record does not come near the level of pervasive conflict in *Mayberry v. Pennsylvania*, for instance, in which the litigant embarked on a long-running personal attack against the judge, calling him

a "dirty sonofabitch," "dirty tyrannical old dog," "stumbling dog," and a "fool." 400 U.S. at 465.  Therefore, the Court finds that Judge Newhouse's statements, while regrettable, were "within the bounds of what imperfect men and women . . . sometimes display," and Sivak has not shown that his expressions of emotion reveal such "deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky,* 510 U.S. at 555.

In reaching this conclusion, the Court is not convinced by Sivak's argument that *Harrison v. McBride*, 428 F.3d 652 (7th Cir. 2005), is instructive.  Unlike the trial judge in *Harrison*, Judge Newhouse did not participate actively in the development of the record in an effort to deflect attention away from the possibility that he may have associated personally with individuals who were connected to criminal activity.  *Id.* at 655-66, 669.

Still, Sivak argues that bias can be seen in the supposedly close-minded manner in which Judge Newhouse approached each successive remand after he imposed the first death sentence.  According to him, the judge considered the matter completed, a *fait accompli*, after 1981.

This case is unique in that it bounced back and forth between the district court and the Idaho Supreme Court over the course of many years.  Such a prolonged procedural history would undoubtedly engender a certain amount of

**Memorandum Decision and Order - 51**

frustration in any reasonable person who wished for finality.  Though it is true that

Judge Newhouse testified at his recent deposition that he "thought it [the case] was

all done" and that "the reasons it was sent back was [sic] ridiculous," he also

added, "but I did it.  I did it over, looked it over with the additional matters and

came to the same conclusion."  (Newhouse Depo., pp. 54, 79-80.)  A review of

record supports this latter observation.  At each resentencing proceeding, Sivak

was given an opportunity to present additional mitigating evidence and to re-argue

why the death penalty should not be imposed.  Nothing in the Eighth or Fourteenth

Amendments demanded that Judge Newhouse relinquish every opinion that he may

have formed based on the evidence that he had already heard, as long as he gave

Sivak additional opportunities to persuade him to alter his view of the case based

on new evidence and argument.  *Liteky*, 510 U.S. at 550-551.

The Court concludes that Sivak has failed to demonstrate that he was denied

a fair capital sentencing hearing in front of an impartial factfinder, and this claim

shall be denied.

## Claim  7:  Double Jeopardy

Sivak next argues that the jury's not-guilty verdict on the charge of

premeditated and deliberate murder with malice aforethought (Count II) prohibited

the trial court from later finding at sentencing that he had the specific intent to kill

**Memorandum Decision and Order - 52**

Wilson during the robbery (the "felony murder plus intent" aggravating circumstance).  Sivak claims that because the jury allegedly decided the intent issue conclusively in his favor, the Double Jeopardy Clause precluded relitigation of that fact during the penalty phase.  The Court is not persuaded that a reversible error occurred.

Sivak's argument relies on the doctrine of collateral estoppel, also known as issue preclusion, which the Supreme Court has held is "a part of the Fifth Amendment's guarantee against double jeopardy." *Ashe v. Swenson*, 397 U.S. 436, 442 (1970).  In *Ashe*, the Court defined collateral estoppel as "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443.

The party seeking to preclude relitigation of an issue bears the burden of proving "that the issue whose relitigation he seeks to foreclose was actually decided in his favor" in the first proceeding.  *Schiro v. Farley*, 510 U.S. 222, 236 (1994) (quoting *Dowling v. United States*, 493 U.S. 342, 350 (1990)) (internal quotations omitted).  The rule of collateral estoppel is not to be applied in a hyper-technical manner but shall instead be reviewed "with realism and rationality":

> [T]his approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and

**Memorandum Decision and Order - 53**

other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'

*Ashe*, 397 U.S. at 444 (citation omitted).

Reviewing the record with realism and rationality, the Court finds that the jury could have grounded its verdict on an issue other than Sivak's specific intent to kill.  For example, the elements of deliberation and premeditation referenced in Count II were not defined by the trial court, and the jury was left to apply its own potentially misinformed or unduly restrictive definition of those terms.  It is possible that the jury found that the State had not proven that Sivak premeditated Wilson's murder–in a lay person's sense of devising a plan well in advance–but that it did not resolve whether Sivak spontaneously formed an intent to kill Wilson after the robbery began.  This scenario seems likely given that the evidence relating to whether Sivak and Bainbridge had a plan in place to kill Wilson when they arrived at the gas station was unclear, at best, but the manner in which Wilson was repeatedly shot and stabbed leaves little room for doubt that she was killed intentionally.

The jury's rejection of *any* element of Count II, such as premeditation, would justify an acquittal on that count, and because the jury "could have based its verdict on an issue other than that which the defendant seeks to foreclose," Sivak

has not established that the finding of specific intent "was actually decided in his favor." *Schiro*, 510 U.S. at 236.  The trial court was free to conclude during the subsequent penalty phase, based on all of the evidence before it, that Sivak intended to kill Wilson.

Even if there were a constitutional error, it did not have a substantial and injurious effect of influence in determining the death sentence.  The sentencer found three other statutory aggravating circumstances proven beyond a reasonable doubt, and it weighed all of the mitigating evidence against each aggravating circumstance individually.  (State's Lodging I-70, pp. 64-66.)  Because the death sentence would stand if this aggravator were eliminated, the error, if any, would not serve as a basis for upsetting the state court's judgment.  *See Hoffman v. Arave*, 236 F.3d 523, 541-42 (9th Cir. 2001).

## Claim 8: Victim Impact Evidence

Relying on *Booth v. Maryland*, 482 U.S. 496 (1987), and *Payne v. Tennessee*, 501 U.S. 808 (1991), Sivak contends that his constitutional rights were violated when the trial court heard testimony from the victim's husband at the 1981 sentencing hearing about the appropriate sentence.  In *Sivak III*, the Idaho Supreme Court agreed, and because the case was going to be remanded on another issue, it instructed the trial court not to consider the husband's testimony.  *Id*. at 415.  In

accordance with this instruction, the trial court later stated "I'm not going to consider, for the record, the testimony of the victim's husband" (State's Lodging I-72, p. 53), and there is no indication that it did.

### Claim 9:  The Psychologist's Report

The defense retained Dr. John Stoner, a psychologist, to conduct a mental evaluation of Sivak.  The presentence investigator obtained a copy of Dr. Stoner's evaluation and attached it to the presentence investigation report (PSI).  In this claim, Sivak alleges that the inclusion of the mental evaluation violated his rights "to be free from self-incrimination, to the effective assistance of counsel, and to a fair sentencing proceeding" under the Fifth, Sixth, Eight, and Fourteenth Amendments.  (Docket No. 296, p. 25.)

Out of an abundance of caution, the State ultimately agreed that the trial court should not consider Dr. Stoner's report or references to the report.  (State's Lodging A-10, pp. 1073-74.)  The trial court accepted this stipulation and concluded that it "will not take the report of Dr. Stoner into account in the course of this sentencing."  (State's Lodging A-10, p. 1074.)  On appeal, the Idaho Supreme Court found that the trial court had not considered the report.  *Sivak I*, 674 P.2d at 404.

Sivak counters that this factual finding is not "not worthy of the presumption

of correctness" because the Stoner report "infect[ed] the sentencing proceedings to this day." (Docket No. 314, p. 71.) He asserts that the recommendation in the PSI that he was not amenable to rehabilitation was based on the report, and that this recommendation influenced the court. (Docket No. 314, p. 71.)

Sivak has pointed to nothing in the court's findings to show that he relied on any information from Stoner's report. Given the protracted history of this case, a wealth of information about Lacey Sivak had been admitted into evidence by 1992. Thus, the state court found that rehabilitation was unlikely not because of any conclusions that Dr. Stoner had reached about Sivak's mental state, but because "it's been tried" and because Sivak now "appears to be institutionalized, and has an extremely difficult time getting along with others." (State's Lodging I-71, p. 61.) Ample evidence supported that finding.

## Claim 10:  Presumption of Death

Sivak contends that Idaho Code § 19-2515(c) creates a presumption that the death penalty must be imposed unless the defendant shoulders a burden to prove that mitigating circumstances outweigh the aggravating circumstances and demonstrates that execution would be unjust. He asserts that this presumption violates the Eighth Amendment requirement of individualized sentencing in capital cases.

The Ninth Circuit has previously rejected this claim, relying on *Blystone v. Pennsylvania*, 494 U.S. 299 (1990).   *Creech v. Arave*, 947 F.2d 873, 886 (9th Cir. 1991), overruled in part on other grounds by *Arave v. Creech*, 507 U.S. 463 (1992).  Additionally, the United States Supreme Court has held that the development and refinement of the procedures for the weighing of mitigating and aggravating circumstances will be left largely to the states, as long as the prosecution is required to prove the existence of the aggravating factors beyond a reasonable doubt.  *See, e.g., Kansas v. Marsh*, 548 U.S. 163 (2006).

### Claim 11:  Statutory Aggravating Factors

In Claim 11, Sivak brings several constitutional challenges to the statutory aggravating factors.  These challenges are without merit.

In concluding that the death penalty was the appropriate punishment, the state court found that four statutory aggravators had been proven beyond a reasonable doubt:  (1) the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity (HAC), Idaho Code § 19-2515(f)(5) (1989); (2) Sivak exhibited an utter disregard for the value of human life, § 19-2515(f)(6); (3) the murder was a first-degree felony murder that was accompanied by the specific intent to cause the death of a human being, § 19-2515(f)(7); and (4) Sivak, both by prior conduct and by conduct in the commission of the offense at hand, exhibited a

propensity to murder that will probably constitute a continuing threat to society, §

19-2515(f)(8).  (State's Lodging I-70, pp. 5-6.)

      1.    <u>Propensity to Commit Murder</u>

Sivak first alleges that the "propensity to commit murder" aggravating

circumstance is unconstitutionally vague under the Eighth and Fourteenth

Amendment.

To minimize the risk of wholly arbitrary and capricious infliction of a death

sentence, states seeking to impose the death penalty must sufficiently narrow the

sentencer's discretion.  *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 189, 206-207

(1976).  A state's death penalty "system could have standards so vague that they

would fail adequately to channel the sentencing decision patterns of juries with the

result that a pattern of arbitrary and capricious sentencing . . . could occur."  *Id.* at

195 n.46.  Claims of vagueness directed at aggravating circumstances defined in

capital punishment statutes assert that the challenged provision fails adequately to

inform sentencers of what they must find to impose the death penalty.  *Maynard v.

Cartwright*, 486 U.S. 356, 361-62 (1988).

In 1983, the Idaho Supreme Court held that the propensity to commit murder

circumstance applies to "a willing predisposed killer, a killer who tends toward

destroying the life of another with less than the normal amount of provocation.  We

**Memorandum Decision and Order - 59**

would hold that propensity assumes a proclivity, susceptibility, and even an affinity toward committing the act of murder." *State v. Creech*, 670 P.2d 463, 471-72 (Idaho 1983).  This definition is sufficiently narrow to channel the sentencer's discretion to focus on the future dangerousness of the offender based on objective facts, as this Court concluded in an earlier case.  *Beam v. Paskett*, 744 F.Supp. 958, 964 (D. Idaho 1990) overruled on other grounds at 3 F.3d 1301 (9th Cir. 1993).

Sivak's argument that the record does not demonstrate that the trial court actually relied on this standard is unavailing.  Where the sentencer is a judge rather than a jury, the federal court must presume that the judge knew and applied any existing narrowing construction.  *Arave v. Creech*, 507 U.S. 463, 471 (1993).

2.   Utter Disregard for Human Life

The "utter disregard" aggravating circumstance has also been given a narrowing construction, which the United States Supreme Court upheld in *Arave v. Creech*, 507 U.S. 463, 471 (1993).

The Idaho Supreme Court held that this aggravator is meant "to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." *State v. Osborn*, 631 P.2d 187, 200-01 (Idaho 1981).  In *Creech*, the Supreme Court noted that a "cold blooded, pitiless slayer" is one who kills without feeling

or sympathy and that a sentencer can find this fact objectively based upon the defendant's "attitude toward his conduct and his victim."  507 U.S. at 472-73.

Again, the trial court is presumed to have applied the constitutional definition when it last sentenced Sivak in 1992.

   3.   Heinous, Atrocious, or Cruel

Idaho's HAC aggravator was limited by *Osborn*, 631 P.2d at 187, 200-01, to the "conscienceless or pitiless crime which is unnecessarily torturous to the victim."  The Ninth Circuit recently turned aside a vagueness challenge to this definition in *Leavitt v. Arave*, 383 F.3d 809, 835 (9th Cir. 2004).

To the extent that Sivak contends that insufficient evidence supported the aggravator on the facts of this case, he is mistaken.  A reviewing court must uphold the application of a constitutionally valid aggravating circumstance if, after viewing the evidence in a light most favorable to the prosecution, the court concludes that any rational trier of fact could have found the essential elements beyond a reasonable doubt.  *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990).

The evidence showed that Dixie Wilson was taken to a small room where she was stabbed and shot several times.  Her blouse was pulled up exposing her breasts.  She was found gasping for breath and bleeding profusely, dying an hour later at the hospital.  A rational finder of fact could determine that this killing was

**Memorandum Decision and Order - 61**

especially heinous, atrocious, or cruel, manifesting exceptional depravity, because it was a conscienceless and pitiless crime that was unnecessarily torturous to the victim.

### 4.    Overlapping Aggravators

The nature of this claim has shifted from the Second Amended Petition to the Brief on the Merits.  In the Petition, Sivak contends that the trial court used the same operative fact–that Sivak intended to kill Dixie Wilson–to find the utter disregard and felony murder/intent to kill aggravating factors.  (Docket No. 296, p. 29.)  In his merits briefing, Sivak broadens the scope of the claim to argue that the trial court used the same facts to support all four statutory aggravating circumstances.[5]

Whatever the nature of the claim, Sivak seems to rely primarily on state law to press his argument, citing *State v. Caudill*, 706 P.2d 456 (Idaho 1985) and *State v. Osborn*, 631 P.2d 187 (Idaho 1981).  Absent a subterfuge to evade federal review, errors of state law are not cognizable in a federal habeas proceeding. *Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir.1994); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to re-

---

[5]  He also contends that the "unconstitutional vagueness" of the utter disregard aggravator allowed the impermissible stacking.  In light of *Creech*, the Court has already found the vagueness claim to be without merit.

**Memorandum Decision and Order - 62**

examine state-court determinations on state-law questions").

While Sivak has not pointed the Court to specific federal authority, the Tenth Circuit, at least, has indicated that "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *United States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir. 1996); *see also United States v. Tipton*, 90 F.3d 861, 899 (4th Cir. 1996) ("[w]e agree with the *McCullah* court that . . . cumulative findings of more than one of the (n)(1) circumstances as an aggravating factor is constitutional error"). But even under this authority, the relevant issue is whether one aggravating circumstance overlaps another circumstance rather than, as Sivak argues, whether the same facts or evidence were used to support facially different aggravators. *Cooks v. Ward*, 165 F.3d 1283, 1289 (10th Cir. 1998).

In other words, "[t]he applicable test 'is not whether certain evidence is relevant to both aggravators, but rather, whether one aggravating circumstance 'necessarily subsumes' the other[s]." *Cooks*, 165 F.3d at 1289 (citation omitted). Moreover, without deciding the matter directly, the Supreme Court has noted that "[w]e have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the 'double counting'

theory that the Tenth Circuit advanced in *McCullah*." *Jones v. United States*, 527 U.S. 373, 398-99 (1999).

Sivak has not shown that any of the statutory aggravating circumstances in this case, as limited by the Idaho Supreme Court, necessarily subsumes another circumstance, and this claim shall be denied.

    5.   <u>Harmless Error</u>

Any constitutional infirmity in the application of single aggravating circumstance would be harmless in this case because the trial court weighed all of the mitigating evidence against each aggravating circumstance individually.  Thus, the death sentence would still stand if an aggravator were eliminated from consideration.  *Pizzuto v. Arave*, 280 F.3d 949, 970-71 (9th Cir. 2001); *Hoffman v. Arave*, 236 F.3d 523, 541-42 (9th Cir. 2001).

## Claim 12:  Non-Statutory Aggravating Circumstances

Sivak next contends that the state district court relied on non-statutory aggravating circumstances that were based on unreliable hearsay and were without any support in the record.  He also alleges that he was not provided with sufficient notice to rebut these facts.

It is true that the state court found that several non-statutory aggravating factors existed in this case, but so long as the sentencer's discretion is sufficiently

guided to comply with the Eighth Amendment's narrowing requirement, "nothing in the Constitution limits the consideration of non-statutory aggravating factors." *Babbitt v. Calderon*, 151 F.3d 1170, 1178 (9th Cir. 1998) (citing *Barclay v. Forida*, 463 U.S. 939, 956 (1983).

As with several other claims, Sivak's primary complaint appears to be directed at the court's findings that "[t]he defendant dominates his co-defendant, and is primarily responsible for all that occurred" and that Sivak "apparently was mentally cool and collected, with the murder being an intentional, rational act." (Docket No. 314, p. 84.)  As this Court has already explained, substantial and competent evidence reasonably supported the trial court's findings related to Sivak's active and prominent role in Wilson's murder.  The jury's acquittal on the charge of premeditated and deliberate murder did not necessarily prohibit the trial court from making these particular findings.

Finally, whatever could be said about whether Sivak had sufficient notice in 1981, he was certainly on notice of these particular factors by the last sentencing hearing in 1992.

## Claim 13: Evidence of Misconduct While Incarcerated

The prosecution called a correctional officer to testify at the 1988 sentencing hearing that he had found a piece of metal eight or nine inches long in Sivak's cell.

(State's Lodging G-59, pp. 159-72.)  Sivak argues that his constitutional right to a fair and reliable sentencing hearing was violated when this testimony was admitted into evidence.

Sivak has not cited any authority for the proposition that a factfinder in a capital case is prohibited from considering an inmate's institutional record while deciding the appropriate sentence, and the Court has found none.  Furthermore, the state court did not refer to this evidence in its findings, and if an error occurred, it did not have a substantial and injurious influence or effect on the determination of the appropriate sentence.  *Brecht*, 507 U.S. at 623.

### Claim 15: Definition of Reasonable Doubt

Sivak next contends that the trial court's jury instructions lowered the constitutional standard of proof necessary to convict, in violation of his rights under the Sixth and Fourteenth Amendments.  Respondent argues in response that Sivak is seeking the retroactive benefit of a new rule of constitutional procedure, in violation of *Teague v. Lane*, 489 U.S. 289 (1989).  The Court agrees.

It has long been established that the Due Process Clause requires the State to prove every essential element of the crimes charged beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1971).  However, in *Cage v. Louisiana*, 498 U.S. 39 (1990), the Supreme Court held, for the first time, that a jury instruction will be

deemed unconstitutional if there is a reasonable likelihood that the jury understood the instruction to allow a conviction without proof beyond a reasonable doubt.  *See Id*. at 41.  Sivak relies heavily on *Cage*, but because *Cage* was issued nearly six years after his judgment of conviction became final in 1984, it is a new rule as applied to this case.

The Court's decision on the *Teague* issue is controlled by *Leavitt v. Arave*, 383 F.3d 809, 817-818 (9th Cir. 2004).  In *Leavitt*, the Ninth Circuit indicated that finality "should be measured from the time when the decision under review . . . was actually made."  *Id.* at 816-17.  Applying that doctrine, the Ninth Circuit concluded that because the petitioner's conviction became final in 1989, he would be denied the benefit of the 1990 *Cage* rule, even though his death sentence did not become final until 1992.  *Id*. at 816.  Sivak's conviction became final when the United States Supreme Court denied his petition for certiorari in 1984, even though his death sentence would not became final for another twelve years.  Sivak argues that *Leavitt* was wrongly decided, but this is not the appropriate forum in which to litigate that issue.

Alternatively, if this claim were not *Teague*-barred, it would fail on the merits.  Sivak's chief complaint is about the trial court's references to the terms "moral evidence" and "moral certainty" in its instructions:

**Memorandum Decision and Order - 67**

> The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty for such degree of proof is rarely possible. *Moral certainty only is required*, which is that degree of proof which produces which produces conviction in an unprejudiced mind.
>
> ***
>
> "Reasonable doubt" is defined as follows: It is not mere possible doubt; because everything related to human affairs, *and depending upon moral evidence,* is open to some possible or imaginary doubt.  It is the state of the case which, after an entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction *to a moral certainty* of the truth of the charge.

(State's Lodging A-2, pp. 19-20.) (Emphasis added.)

In *Victor v. Nebraska*, 511 U.S. 1 (1994), the Supreme Court addressed similar complaints about the use of these terms.  There, the Court was untroubled by the phrase "moral evidence," because, when placed in the context of the words immediately surrounding it, the jury would have understood that "moral evidence" meant the same thing as "the proof introduced at trial."  *Id*. at 13.  The Court was further reassured by language that informed the jury that it must base its decision solely on the evidence that had been presented at trial.  *Id*.  This is equally true here; the trial court informed the jury that its decision must be based upon the evidence presented in court and not on any other extraneous factor.  (*See* State's Lodging A-2, pp. 4, 5.)

**Memorandum Decision and Order - 68**

The Supreme Court was slightly more concerned with the phrase "moral certainty," which it noted may not bring the same archaic meaning to a modern jury (essentially, subjective certitude based on proof beyond a reasonable doubt). Yet the Court still did not find constitutional error, as it determined that the rest of the instructions provided content to that potentially ambiguous phrase. *Id*. at 14, 21. The jurors were told that they must have an "abiding conviction" of the truth of the charge, which, without reference to moral certainty, correctly states the prosecution's burden of proof and "does much to alleviate the concerns that the phrase 'moral certainty' might be misunderstood in the abstract." *Id*. This same qualifying remark was included in the set of instructions in the present case, and the requirement that the jury may rely only on evidentiary proof was also included.

As in *Victor*, this Court concludes that there is no reasonable likelihood that the jury applied the reasonable doubt instructions in this case in an unconstitutional manner.

## Claim 18:  Right to Jury Sentencing

Based on *Ring v. Arizona*, 536 U.S. 584 (2000), Sivak alleges that his Sixth Amendment right to a jury trial was violated because a judge rather than a jury decided the aggravating circumstances that made him eligible for the death penalty. He acknowledges that the Supreme Court has since determined that *Ring* is not

retroactive to cases that were final when it was decided, *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004), but he argues that dispositive differences between the Idaho statutory scheme and the Arizona statute at issue in *Summerlin* mandate a different result here. The Ninth Circuit has already concluded that *Summerlin* applies in Idaho cases to bar relief under this theory on collateral review. *Hoffman v. Arave*, 455 F.3d 926, 940 n.7 (9th Cir. 2006); *Leavitt*, 383 F.3d at 813. This Court is bound by the Ninth Circuit's decision.

Sivak also contends that his rights to due process and equal protection were violated because the Idaho courts failed "to apply the rights and guarantees of its own constitution and laws requiring a jury to determine all questions of fact." (Docket No. 314, p. 95.) He did not plead this issue in his Petition, and the Court could safely dispose of the matter on that basis alone. What's more, to grant relief, this Court would be required to conclude that the Idaho Supreme Court has consistently misinterpreted its own constitution and statutes. *See, e.g., State v. Leavitt*, 120 P.3d 283, 286 (Idaho 2005). The interpretation of a state's constitution and statutes is solely a matter of state law, and Sivak's attempt to transform this issue into a federal question is unavailing. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

**Memorandum Decision and Order - 70**

## CERTIFICATE OF APPEALABILITY

In the event Sivak files a timely notice of appeal from the Court's judgment, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability (COA) or state the reasons why such a certificate should not issue.  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

Bearing in mind that this is a capital case, the Court finds that reasonable

jurists could debate its resolution of the issues set forth in Claims 1-7, including the Court's decision to deny additional discovery and an evidentiary hearing on any of these claims.  On the other hand, for the reasons stated in this Memorandum Decision, the written decisions dismissing claims as procedurally defaulted (Docket Nos. 170, 279), and the written decisions denying Sivak's motions for discovery and an evidentiary hearing (Docket Nos. 279, 295), the Court declines to issue a certificate of appealability with respect to all remaining issues or claims in this case.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that the Second Amended Petition for Writ of Habeas Corpus shall be DENIED.

IT IS FURTHER ORDERED that this cause of action shall be DISMISSED with prejudice.

IT IS FURTHER ORDERED that the Court shall issue a Certificate of Appealability over the Court's resolution of Claims 1, 2, 3, 4, 5, 6, and 7 in the Second Amended Petition, including the Court's decision to deny additional discovery and an evidentiary hearing on any of these claims.  The Court shall not certify any other issue or claim for appeal in this case.

IT IS FURTHER ORDERED that upon the filing of a notice of appeal in this

case, and not until such time, the Clerk of Court shall forward the necessary

paperwork to the Court of Appeals for the Ninth Circuit for the docketing of an

appeal in a civil case.

DATED:  **March 21, 2008**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order - 73**